IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.  12-cv-01952-WYD-MEH

SETH WARNICK, on behalf of himself and all others similarly situated,

   Plaintiff,

v.

DISH NETWORK LLC,

   Defendant.

---

## ORDER ON SUMMARY JUDGMENT

---

I.   INTRODUCTION

This matter is before the Court on Defendant DISH Network L.L.C.'s Motion for

Summary Judgment Against Plaintiff Seth Warnick filed February 3, 2014.  A response

was filed on February 24, 2014, and a reply was filed on March 17, 2014.  Thus, the

motion is fully briefed.  Defendant DISH Network L.L.C. ["DISH"] seeks summary

judgment as to Plaintiff's claims for negligent and willful violation of the Telephone

Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ["the TCPA"].  Plaintiff alleges that

DISH made automated calls to his cellular telephone number, without his prior express

consent, in violation of 47 U.S.C. § 227(b)(1)(A)(iii).

DISH argues that the TCPA does not regulate the type of calls at issue here that

are made to business numbers.  It also argues that DISH's dialing system does not

satisfy the statutory definition of an "automatic dialing system" or "ATDS".  Finally, DISH

argues that the TCPA was not intended to regulate informational calls that a service company, such as DISH, makes to its customers about their account.  It asserts that the facts in this case, taken as a whole, do not warrant a finding of any violation.  Warnick's phone records indicate that only one call was received, he was not the intended recipient, and he was not charged or otherwise injured.  As for count two for treble damages, this claim fails according to DISH because there are no facts that DISH "willfully" or "knowingly" violated the TCPA.

II.   <u>STATEMENT OF FACTS</u>

I note at the outset that I will cite to the evidence only where there is a genuine dispute about the fact(s) or where I otherwise deem it appropriate.  I also note that Plaintiff has sometimes cited only to portions of a particular numbered paragraph that he denies.  To the extent he did not deny the remaining parts of the paragraph, I will assume that the facts are admitted.  Indeed, in order to constitute a proper denial of a fact, the denying party must provide a factual explanation of the reason(s) for the denial and a specific reference to material in the record supporting the denial.  *See* Practice Standards, Section III.B.4 and 5; Fed. R. Civ. P. 56(c).  Finally, I will refer to the exhibits attached to DISH's motion and reply as "Def.s Ex. __" and the exhibits attached to Plaintiff's response as "Pl.'s Ex. __".

<u>Defendant DISH</u>

DISH provides direct broadcast satellite television services to customers throughout the United States.   DISH had approximately 12-14 million current customers in the United States from 2008 to 2012.

Due to the nature of multichannel video services and DISH's goal to provide the best customer services and ongoing subscription television service, DISH and its customers communicate with each other often.   DISH offers 24-hour customer service lines and handles millions of inbound and outbound calls monthly.   Customers call and/or are called for a wide variety of reasons, such as purchasing a Pay-Per-View event, requesting to upgrade equipment, making a payment, and questioning a bill.

DISH's Records Regarding Plaintiff's Telephone Number

The sole source of the telephone numbers that DISH utilizes when it makes account information calls are the customers themselves, which are entered into DISH's customer account database ["CSG"].   Plaintiff does not dispute this.   DISH asserts that it requires each customer to provide contact information and expressly consent to be called.   (Affidavit of Shannon Picchione ("Picchione Aff."), ¶¶ 10-11, attached to DISH's motion.)   Plaintiff does not dispute that each DISH customer contractually agrees to keep his or her telephone number up to date.   He does dispute DISH's claim that its customers "expressly consent to be called" as a conclusion of law.   In reply, DISH points out that the actual language of the agreements reflect express authorization.[1]

DISH also asserts that it verifies the customer's number is accurate when scheduling the installation and usually every time the customer calls.   (Picchione Aff., ¶¶ 10-11.)   Plaintiff denies that DISH verifies that customer telephone numbers are

---

[1] *See id.*, Ex. A at DISH 152, DISH 164, DISH 5635 – "By signing above, you authorize: (1) DISH to contact you regarding your DISH Network account at the phone number (including any cellular phone number), . . . you have provided in this Agreement or at any other . . . phone number (including any cellular phone number) that you otherwise provide or have provided to DISH . . . ."; DISH 2689-90 – "Any notice required or permitted to be given by us under this Agreement may be provided . . . by telephone . . . .You must give us immediate notice of any change of . . . telephone number. . .").

correct "usually every time the customer calls." He asserts that Ms. Picchione stated only that it is "routine" to verify information, without providing any details or evidence of relevant policies. (*Id.*, ¶ 11.) In reply, DISH states, and I agree, that it presented uncontroverted evidence through Ms. Picchione's Affidavit that the agents verify customer contact information before installation of equipment and re-verify the information each time a customer calls DISH.

In November 2010, Plaintiff's telephone number was entered in the CSG database as the current number of a then-current DISH customer account. It is unclear why the number was added, although the notes reflect that the customer had called DISH. The new phone number, which actually belongs to Plaintiff, was either provided by the customer or the result of a data entry error during a conversation. Plaintiff's telephone number remained in DISH's records for about four months.

DISH asserts that its records show that it attempted to make eight calls to Plaintiff's number. (February 3, 2014 Affidavit of Joey Montano [2014 Montano Aff."], ¶¶ 11-12 and Ex. A, attached to DISH's motion.) Five of the calls, according to DISH, were payment reminder calls, and three were customer satisfaction survey calls that were sent after and because someone called into DISH. (*Id.* ¶ 16, Ex. B.) Plaintiff denies that DISH merely "attempted" to make the calls. He asserts that DISH *did* make eight calls to him, all of which either went to his voicemail or were answered by him. DISH notes correctly, however, that Plaintiff submitted no declaration or affidavit as to this.

Plaintiff asserts that DISH's dialing system detects and notates the results of the calls made by the dialer. (Pl.'s Ex. 9 – Montano Aff. of September 16, 2013 ["2013

Montano Aff."] ¶¶ 13- 15 and Ex. B-1 thereto.)  For instance, if the call was not answered, then the call result column shows "No Answer."  (*Id.* at Ex. B-1.)  For each of the calls at issue, the dialer detected either a "positive voice" or "answering machine" on the receiving end.  (Id. at ¶¶ 13-15, Ex. B-1.)  According to DISH and its expert witness Dr. Aron, "positive voice" means that the dialer detected a human voice on the receiving end, either from a live answer or in the called party's voicemail greeting.  (*Id.* at ¶ 15; Pl.'s Ex. 10 - Dr. Aron's Expert Report at ¶ 72 and n. 93.)[2]

In reply to Plaintiff's response in the above paragraph, DISH states that its assertion that it attempted to call Plaintiff eight times but "made" only one call is borne out by the evidence that Plaintiff's telephone records show only one call from a DISH number.  (2014 Montano Aff. ¶¶ 11-12, Ex. A; Def.'s Ex. 5  – Warnick Bates Stamped Telephone Records at Warnick 151; Def.'s Ex. 7 – Pl.'s Resp. to RFA No. 4 – admitting that DISH's telephone number appears only once in the telephone records he produced.)  Further, Plaintiff testified that he "answered one call and . . . [t]here was another call that left a message, and previous to that there were maybe 15 to 20 calls that I did not answer."  (Def.'s Ex. 18 – Supp. Warnick Dep. at 12:3-9.)  While Plaintiff argues that he called his voicemail and heard a message from DISH, DISH notes that he has not produced any evidence of this despite having multiple opportunities to do so.

---

[2] Plaintiff also denies that the survey calls were made to him as a result of any call *from him* to DISH; rather DISH's dialer system placed survey calls to Plaintiff's number on January 7 and 8, 2011, because the actual DISH customer had called DISH the day before those calls and Plaintiff's number was associated with her account.  (2014 Montano Aff. ¶ 10; Ex. B to Montano Aff. at Bates # DISH0002404 .)

DISH asserts that the following chart compares DISH's records that show the calls it attempted to make to its customer with Plaintiff's telephone records:

| NO. | DATE & TIME | DISH ATTEMPTED CALL | WARNICK PHONE BILL |
|-----|-------------|---------------------|--------------------|
| 1 | 11-29-10<br>4:03 p.m. | Day 25 Payment Reminder<br>(Montano, Ex. A - DISH 000141) | Shows no call from a DISH number on 11-29-10.<br>(Exs. 4, 5 - Warnick 134.) |
| 2 | 12-22-10<br>11:41 a.m. | Day 47 Payment Reminder<br>(Montano, Ex. A - DISH 000141) | Shows no call from a DISH number on 12-22-10.<br>(Exs. 4, 5 - Warnick 114, 150-51) |
| 3 | 12-28-10<br>10:17 a.m. | Day 53 Payment Reminder<br>(Montano, Ex. A - DISH 000141) | Shows no call from a DISH number on 12-28-2010.<br>(Exs. 4, 5 - Warnick 114, 151) |
| 4 | 12-29-10<br>12:25 p.m. | Day 25 Payment Reminder<br>(Montano, Ex. A - DISH 000142) | Shows a call from 866-668-8047 but shows **no charge** for the call. (Exs. 4, 5 - Warnick 114, 151) |
| 5 | 01-07-11<br>9:43 a.m. | Survey Call<br>(Montano, Ex. A - DISH 000142) | Shows no call from a DISH number on 1-7-2010.<br>(Exs. 4, 5 - Warnick 166) |
| 6 | 01-07-11<br>11:18 a.m. | Survey Call<br>(Montano, Ex. A - DISH 000143) | Shows no call from a DISH number on 1-7-2010.<br>(Exs. 4, 5 - Warnick 166) |
| 7 | 01-08-11<br>10:30 a.m. | Survey Call<br>(Montano, Ex. A - DISH 000144) | Shows no call from a DISH number on 1-8-2010.<br>(Exs. 4, 5 - Warnick 166) |
| 8 | 01-29-11<br>11:03 a.m. | Day 25 Payment Reminder<br>(Montano, Ex. A - DISH 000144) | Shows no call from a DISH number. (Exs. 4, 5 - Warnick 168-69) |

(2014 Montano Aff. ¶¶ 8, 11-14 and Ex. A; Def.'s Ex. 3 – Seth Warnick Dep. ["Warnick Dep."], Def.'s Ex. 5 – Warnick Telephone Records.)

Plaintiff denies that the above chart shows calls that DISH merely "attempted" to call for the reasons stated earlier.  He also denies that lack of a call entry from a DISH telephone number in Plaintiff's phone records shows that DISH did not make the call. DISH's own expert testified that Plaintiff's phone records would not identify calls that went to his voicemail.  (Pl.'s Ex. 11 – Dr. Aron Dep. at 60:19-23 (Q: So you don't know how many calls were answered by the voicemail.?  A: That's right. And that can't be determined by reference to his call records"); Pl.'s Ex. 10 – Dr. Aron Report at ¶ 72 ("it is not possible to determine from call detail records how many of the unanswered calls reached voice mail . . . .")

Plaintiff asserts that his phone records nevertheless establish that certain of DISH's calls went to his voicemail because they show that he called his voicemail to retrieve a message within a few hours of each call from DISH:

| NO. | DATE & TIME | DISH ATTEMPTED CALL | WARNICK PHONE BILL |
| --- | --- | --- | --- |
| 1 | 11-29-10 4:03 p.m. | Day 25 Payment Reminder (Montano, Ex. A - DISH 000141) | Plaintiff's call to voicemail at 5:07 p.m. (Ex. 5 – Warnick 134.) |
| 2 | 12-22-10 11:41 a.m. | Day 47 Payment Reminder (Montano, Ex. A - DISH 000141) | Plaintiff's call to voicemail at 12:43 p.m. (Ex. 5 – Warnick 150) |
| 3 | 12-28-10 10:17 a.m. | Day 53 Payment Reminder (Montano, Ex. A - DISH 000141) | Plaintiff's call to voicemail at 11:20 a.m. (Ex. 5 – Warnick 151) |
| 4 | 12-29-10 12:25 p.m. | Day 25 Payment Reminder (Montano, Ex. A - DISH 000142) | Shows a live answer of call from DISH (866-668-8047) (Ex. 5 – Warnick 151) |

| 5 | 01-07-11<br>9:43 a.m. | Survey Call<br>(Montano, Ex. A - DISH 000142) | Plaintiff's call to voicemail<br>at 12:19 p.m. (Ex. 5 –<br>Warnick 166) |
|---|---|---|---|
| 6 | 01-07-11<br>11:18 a.m. | Survey Call<br>(Montano, Ex. A - DISH 000143) | Plaintiff's call to voicemail<br>at 12:19 p.m. (Ex. 5 –<br>Warnick 166) |
| 7 | 01-08-11<br>10:30 a.m. | Survey Call<br>(Montano, Ex. A - DISH 000144) | Plaintiff's call to voicemail<br>at 4:16 p.m. (Ex. 5 –<br>Warnick 166) |
| 8 | 01-29-11<br>11:03 a.m. | Day 25 Payment Reminder<br>(Montano, Ex. A - DISH 000144) | Plaintiff's call to voicemail<br>at 3:41 p.m. (Ex. 5 –<br>Warnick 168) |

While I agree that the above evidence establishes that Plaintiff called his voicemail to retrieve a message within a few hours of each call from DISH, this does not necessarily establish that DISH's calls went to his voicemail and/or that Plaintiff called his voicemail because of messages from DISH.  DISH notes that Plaintiff never discussed or disclosed these voicemail messages before, and he redacted every single entry on his phone records.[3]  Moreover, he did not provide an affidavit on this point.

Plaintiff Seth Warnick

As noted previously, Plaintiff's telephone bills show that only one call from a DISH number was received.  (Def.'s Ex. 4 – Warnick Dep. Exhibit, Ex. 5 – Warnick 114, 151; Def.'s Ex. 7 – Warnick Resp. to RFA No. 4; 2014 Montano Aff. ¶ 8.)  Plaintiff denies this, pointing to his chart in the previous section that he contends shows that certain of

---

[3] DISH notes that Plaintiff's counsel heavily redacted the phone records, describing all other entries as irrelevant.  (*See* Ex. 5 – Bates Stamped Telephone Records at Warnick 134, 150-151, 166, 168, 169.)  Now, Plaintiff claims these redacted entries – that DISH could not depose Plaintiff about – reflect calls from DISH.  I agree with DISH that Plaintiff cannot have it both ways. The only non-redacted number is the one call Plaintiff answered on December 29, 2010.  (*Id.* at Warnick 151.)

DISH's calls went to his voicemail because he called his voicemail to retrieve a message within a few hours of each call from DISH.  However, I found in the previous section that this assertion is not supported.  Plaintiff also points, however, to evidence showing "positive voice" or "answering machine" for each of DISH's calls to him and the fact that Dr. Aron testified that it cannot be determined from these records whether the calls went to voicemail.  (Pl.'s Ex. 9 – 2013 Montano Aff. and Ex. B-at Bates # DISH0000141-DISH0000144; Pl.'s Ex. 11 – Dr. Aron Dep. at 60:19-23; Pl.'s Ex. 10 – Dr. Aron Report at ¶ 72; *see also* 2013 Montano Aff. at ¶¶ 13- 15.)  Moreover, I note that while Plaintiff testified in his deposition that he remembers only one call that left a message, he prefaced that testimony by stating he did not know the exact number of calls he received on his cell phone.  (Def.'s Ex. 18, Supp. Warnick Dep. at 12:3-8.)  I find from the foregoing that there are genuine issues of material fact as to how many of DISH's calls went to Plaintiff's voicemail.[4]

Plaintiff never notified DISH that DISH called the wrong number.  His number was removed from the company's customer account database in or about March 2011.

Plaintiff admitted in his deposition that he used his phone number for business purposes during the relevant period.  (Def.'s Ex. 3 – Warnick Dep. at 35:23-25, 37:3-9.) Plaintiff produced two business cards, one for his employer Microsoft and another for one of the three companies that he founded and operated, listing his cellular telephone

---

[4] In so finding, I reject DISH's argument that Dr. Aron's report and testimony that the records show only one of the calls was answered undermines Plaintiff's position.  (*See* Pl.'s Ex. 10 – Dr. Aron Report at ¶ 72; Pl.'s Ex. 11 – Dr. Aron Dep. at 60:6-15.)  This testimony does not undermine or address the evidence that shows "positive voice" or "answering machine" for the other calls from DISH and her testimony that it cannot be determined from the phone records which of these other calls went to Plaintiff's voicemail.

number as his business line.  (Def.'s Ex. 8 – Warnick 000113.)  Further, Plaintiff testified

that this number was used to communicate with Microsoft coworkers and clients.  (Def.'s

Ex. 3 – Warnick Dep. at 35:23-36:12, 37:3-9.)  DISH also produced evidence that

Plaintiff's telephone number was connected to two other companies that he founded.

(*Id.* at 66:8-21, 74:8-13, 75:14-22, 76:8-22); Def.'s Ex. 6 – Business Webpages.)

Plaintiff denies that his cellular telephone is a "business phone."  He testified in his

deposition that it is his personal cell phone (Pl.'s Ex. 12, Warnick Dep. at 37:1-2), that he

uses this phone primarily for personal reasons (*id.* at 36:13 – 37:2), and that he paid for

the phone.  (*Id.* at 72:2-5).  Plaintiff also testified that he does not know anything about

the third party website listings in DISH's Exhibit 6 and that he does not recall associating

his cellular telephone number with those companies.  *Id.* at 76-77.

DISH asserts that Plaintiff admits he never registered this business phone number

on a Do-Not-Call list.  (Def.'s Ex. 3 – Warnick Dep. at 70:15-24.)  Plaintiff again denies

that this is a business number.  (*Id.* at 36:13-37:2.)  He also denies admitting to not

registering it on a do not call list.  When asked whether his phone was on a do-no-call

list, Plaintiff said , "Not to my recollection" and then "I don't recall if I have or not."  (*Id.*

70:19-24.)  Further, he asserts that it was on a Do-Not-Call list, as DISH's own business

records show that his number was on both the federal and Texas Do-Not-Call lists as of

2005.  (Pl.'s Ex. 13 - Montano Dep. at 69:15-20 and Ex. 7 thereto at DISH0002460.)

DISH asserts that there was no charge for the one call that appears on Plaintiff's

telephone records.  (Def.'s Ex. 5 –Warnick 114, 151 – showing a charge of zero for the

Dec. 29, 2010 call; Def.'s Ex. 3 – Warnick Dep. at 38:16-23.)  It cites testimony from

Warnick to the effect that his minutes are paid for as a whole, per month, with an unlimited plan, and that he would have paid the same amount in the months when DISH called him whether Dish made the calls or not.  (Def.'s Ex. 3 – Warnick Dep. at 58:24-59:25.)  DISH also points to the following deposition testimony of Plaintiff:

> Q. Well, are you asking that Dish pay you damages for the fact that they made these calls to you?
> A. I'm not asking Dish to specifically pay me. I'm asking -- I'm representing the class.

(*Id.* at 88:21-25.)

In response to the previous paragraph, Plaintiff denies that there was no charge for the call that appears on his telephone records, asserting that his wireless carrier charges Plaintiff to receive incoming calls by paying in advance for such calls.  (Def.'s Ex. 3 – Warnick Dep. at 38:21-23 –"According to this record, there's no specific charge for that number; however, it is encompassed with my overall bill"); 59:2-3.)

DISH also asserts that Plaintiff was not deprived of access to or use of his telephone, citing the following:

> Q. Was there ever a time where, because of the conduct that you claimed or alleged against Dish in this case, where your phone became unavailable to you because of loss of battery life?
> A. There was no time that I'm aware of that it became unavailable specifically because of their call, resulting in loss of battery life.

(Def.'s Ex. 3 – Warnick Dep. at 58:8-14.)  Plaintiff denies this, asserting that DISH's robocalls were unwanted and citing his testimony that DISH's calls wasted his time, degraded his battery life, and consumed services on his telephone account that deprived

him of the use of his telephone for his chosen purposes and degraded the battery life of his telephone.  (Def.'s Ex. 12 – Warnick Dep. at 28:5-13.)

In reply to the foregoing, DISH notes that Plaintiff never testified and provided no affidavit that DISH's call prevented him from receiving or placing calls.  The one call from a DISH number that appears in his telephone records lasted less than two minutes. (Def.'s Ex. 5 at Warnick 151.)  The next call in his records for December 29, 2010, occurred over six hours later.  (*Id.*)  As for the other calls, he explains he never answered them or they were made when his phone was off.  (Def.'s Ex. 7 – Pl.'s Resp. to RFA No. 4; Def.'s Ex. 19 – Pl.'s Interrog. Resp. No. 22.)  Plaintiff testified that he was "aggravated" because he perceived the call to be for debt collection purposes.  (Pl.'s Ex. 12 – Warnick Dep. at 28:5-13.)  But the scripts of the calls show that these were *not* debt collection calls.  (2014 Montano Aff. ¶ 14, Ex. A.)  As to Plaintiff's argument that DISH "degraded" the battery life of his telephone, he testified that his telephone did not become unavailable or lose power because of any call from DISH, he did not measure any negative effects from the call, and his telephone was off or he did not answer any other calls.  (Def.'s Ex. 3 – Warnick Dep. at 58:8-14; Def.'s Ex. 18 – Supp. Warnick Dep. at 12:3-9; Ex. 19 –  Pl.'s Interrog. Resp. No. 22.)

DISH's Dialing System

In circumstances where DISH is able to anticipate common questions and issues, it uses modern calling technology to reach out efficiently to its affected customers with important account and service information.  Just a few examples of typical nonmarketing

calls are:  technician appointment calls, calls related to weather events, account-related calls, and customer satisfaction calls.

DISH's dialing system is comprised of dialer software and hardware from Cisco Systems, Inc. and separate software from Austin Logistics that manages the call campaigns.  DISH asserts that according to Tod Famous, Cisco's Director of Product Management for Contact Center products who has worked at the company for many years and is particularly familiar with the CISCO dialer's capabilities, DISH's equipment does not, and cannot, store, generate or dial numbers that have been randomly or sequentially generated.  (Def.'s Ex. 2 – Todd Famous Dep. ["Famous Dep."] at 4:6-10, 8:1-9:10, 29:20-31:16, 41:21-42:10, 42:15-43:21, 45:5-15, 73:17-74:2, 111:2-13.)  In other words, it dials numbers it has been told to dial; it does not dial random numbers or numbers in sequence.  (*Id.* 42:19-43:21.)  DISH cites to his Declaration which states:

> The Cisco Dialer that DISH uses: (a) is not configured, and does not have the capacity, to store or generate telephone numbers using a random or sequential number generator; (b) must be, (but has not been), upgraded with separate software to give it the capacity to do so; (c) cannot function without a list of telephone numbers provided by an external software source, (i.e. DISH's campaign manager); and (d) does not have the capacity to randomly or sequentially generate telephone numbers using a number generator without fundamentally changing the architecture of the hardware and software.

(Def.'s Ex. 1 – Todd Famous Decl. ¶ 3; *see also* 2014 Montano Aff. ¶ 8.)

Plaintiff denies the allegations in the previous paragraph, and asserts they are legal conclusions.  He further denies that Mr. Famous's statements accurately describe the dialer's capabilities.  The dialer itself, according to Plaintiff, generates dialing lists by operation of query rules.  (Pl.'s Ex. 14 – Dialer Manual at pp. 13-14; Pl.'s Ex. 15 –

Famous Dep. at 85:19-87:16 – "The numbers that are dialed are determined by the query rule").  Further, the dialer stores the lists of telephone numbers that it is supposed to dial.  (Pl.'s Ex. 15 – Famous Dep. at 42:2-3; 74:6-75:7 – testifying that after it has been provided the numbers it is supposed to dial, the dialer stores the numbers in a database that is part of the dialing system.)  Plaintiff asserts that the dialer even has a sequential dialing mode, in which it sequentially dials multiple numbers associated with an account.  (*Id.* at 44-20-45:4; 72:9-73:12; Ex. 14 – Dialer Manual at pp. 11, 23.)

At Mr. Famous's deposition, DISH asserts that he was exhaustively questioned about the dialer's capacity and capabilities to randomly or sequentially generate telephone numbers.  (Def.'s Ex. 2 – Famous Dep., 45:5-15 – "The dialer is given a list of phone numbers, and then it dials them.  It doesn't fabricate them.  It doesn't generate them.  It doesn't come up with them on its own.  It's told to dial certain phone numbers."; 74:1-2 – "[t]here is no generation that occurs in the Cisco Dialer"; 111:5-7 – "The dialer doesn't generate numbers.  It dials the numbers that have been loaded into it.".)  While Plaintiff admits that Mr. Famous was questioned about the dialer's capabilities, he denies that the selected quotations accurately describes the dialer's capabilities, citing to his assertions in the previous paragraph.

Mr. Famous also explained that the dialer "doesn't randomly dial phone numbers, and it also doesn't generate a random list of phone numbers and dial those explicitly.  So there is in no way any randomness to what it does."  (Def.'s Ex. 2 – Famous Dep. at 42:1-10.)  As for the capacity of the dialer to generate numbers sequentially, he testified:

> It dials the number that it has been told to dial. It doesn't dial random numbers, and it doesn't dial numbers in sequence. . . . [I]t doesn't dial the number one, two, three, four and then one, two, three, five and then one, two, three, six. . . . [I]t doesn't randomly cycle through numbers, and it also doesn't cycle through numbers incrementing them dialing one number and then dialing the next one. It dials the first number it's been told to dial, and it dials the next number it's been told to dial. . . . [I]t's not the capability of the product to dial in sequence. . . . It dials the numbers that it's been told to dial.

(*Id.* at 42:19-43:21.)

DISH asserts that to effectuate a call, someone at DISH must be involved at every step of the process.  (2014 Montano Aff. ¶ 7; *see also* Def.'s Ex. 2 – Famous Dep. at 71:5-8.)  "The system doesn't run on its own . . . The system doesn't operate without people, lots of people, in fact, actually involved in its administration and operation." (Def.'s Ex. 2 – Famous Dep. at 105:19-106:1; 111:11-13.)  Specifically, DISH asserts that the person must:  (a) determine which calling campaign will be identified and set up the rules; (b) identify and create the list of 16-digit account numbers that meet the criteria for the calling campaign; (c) input that list into a processing application that compiles a text file of account information, including account telephone numbers, the correct contact information, and the correct information, notice or alert message, (d) import the text file into the Campaign Manager software; and (e) ensure that the calls are properly made. (2014 Montano Aff. ¶ 7; Def.'s Ex. 2 – Famous Dep. at 113:5-13.)

Plaintiff denies that a person is involved at every step in the process.  He asserts that the dialer manual describes the dialer as an "Automatic Dialer."  (Pl.'s Ex. 14 at 7-8.) The Dialer itself dials the numbers automatically and without human intervention, often dialing multiple numbers simultaneously.  (*Id.* at 17-19 – describing progressive and

predictive dialing modes); Pl.'s Ex. 15 – Famous Dep. at 90:14-92:20 – describing

progressive and predictive dialing modes, and testifying that the dialer is a predictive

dialer or has the capacity to be a predictive dialer.)  Mr. Famous stated that the dialer

itself places the call over the carrier network and plays a prerecorded message; no

employee is on the call.  However, the calls are only placed if someone loads them into

the dialer.  (Pl.'s Ex. 15 – Famous Depo at 67:3-71:8.)  The query rule generates the

dialing list.  (*Id.* at 86:21-87:16; Ex. 14 – Dialer Manual at p. 14.)

<u>Plaintiff's Additional Facts</u>

Plaintiff asserts that DISH makes hundreds of thousands of robocalls each day

through various outbound dialing "campaigns," including "informational" calls (such as

payment reminders), customer satisfaction surveys, and telemarketing calls.  (Pl.'s Ex.

13 – Montano Dep. at 10:2-11:8, 101:20-103:18.)  DISH objects to use of the term

"robocalls" to describe informational calls, but otherwise admits this fact.

According to Plaintiff, all of DISH's "informational" and survey calls are made

through "unassisted outbound campaigns using prerecorded messages," which means

that there is no DISH employee on the line when the number is dialed and no DISH

employee on the line when the prerecorded message is played.  (Pl.'s Ex. 15 – Famous

Dep. at 67:3-71:8; Pl.'s Ex. 13 – Montano Dep. at 43:14-19 – testifying that survey calls

use a pre-recorded voice; 51:20-52:14 – testifying that informational calls use a pre-

recorded voice).  DISH denies these allegations, stating that a calling campaign requires

significant human intervention; the dialer cannot make calls "unassisted."  (Montano Aff.,

¶ 7 – listing each step of human intervention; Def.'s Ex. 2 – Famous Dep. at 111:2-24,

113:1-13 – explaining how the dialer cannot work without step-by-step individual involvement, including the fact that a person creates the query rules .)  In addition, DISH asserts that customer satisfaction survey calls are made *after* and in response to a call from a person (such as here).  (Montano Aff. ¶ 16, Ex. B at DISH 2404 – showing someone from Warnick's cell phone called DISH on January 7 and 8, 2011.)  DISH also denies that these facts asserted by Plaintiff are material or relevant to the motion.

Plaintiff asserts that each of the eight robocalls that DISH made to him was either an "informational" call or a survey call, both of which used a pre-recorded voice, and the script of which is shown in DISH's dialer records.  (Pl.'s Ex. 9 – 2013 Montano Aff. at Ex. B-1 – "Please listen to this important message from DISH Network…..," "Do you have approximately 3 minutes today to complete a brief survey… If yes, please press one. If no, press two.")  In response, DISH again asserts that a comparison of DISH's dialer records and Plaintiff's call records show DISH *attempted* to make eight calls but that only one of them was answered.  DISH otherwise admits this fact.

Plaintiff asserts that the manual for DISH's dialing system states, and Mr. Famous confirmed, that DISH's dialing system operates as a "predictive dialer" by using computer software to predict when an employee will be available to take a call and thereby optimize the dialer's calling rate.  (Pl.'s Ex. 14 – Dialer Manual at  17-19; Pl.'s Ex. 15 – Famous Dep. at 90:14-92:20.)  DISH denies that this accurately reflects Mr. Famous' testimony or DISH's dialer, or that it is a material fact.[5]

---

[5] DISH asserts that Mr. Famous first testified he was not clear on the capacity of DISH's system and that certain components require "more capacity."  (Pl.'s Ex. 15 – Famous Dep. at 89:5-14.)  Second, DISH asserts that Mr. Famous defined "predictive dialer" in the context of his understanding of how the

Plaintiff asserts that although DISH "scrubs" its dialing lists to remove cellular telephone numbers before placing telemarketing robocalls, DISH did not scrub to remove cellular telephone numbers before making the so called "informational" or survey robocalls of the type that Plaintiff received.  (Pl.'s Ex. 9 – 2013 Montano Aff. at ¶¶ 8-9, 18.)  In response, DISH admits that it does not scrub out the cellular numbers provided by its customers, questioning how it could do that.  These numbers are provided *by the customers* so that DISH will call them about their service, as discussed previously.

As a result of its decision not to scrub, Plaintiff asserts DISH ended up making thousands of "informational" and "survey" robocalls to the cellular telephone numbers of persons who were not DISH customers, which generated thousands of complaints from noncustomers that DISH tracked in its "TCPA Tracker" system.  (Pl.'s Ex. 16 – TCPA Tracker Manual at DISH0002731-2732 – showing how DISH employees notate whether person complaining is a customer or noncustomer); Pl.'s Ex. 17 – Expert Report of Robert Biggerstaff – discussing a portion of the TCPA Tracker data and its identification of approximately 26,000 noncustomers who had complained about receiving DISH's calls on their cellphones between July 2008 and July 2012.)

DISH denies the facts in the previous paragraph.  First, DISH asserts that scrubbing has no bearing on the informational calls that it sends to the numbers its customers provide.  Second, Plaintiff concedes that he received only one call, and he never called DISH to complain, thus DISH asserts any discussion of the TCPA Tracker is

---

Cisco system could work, not in the context of a legal definition or DISH's dialer.  Moreover, it asserts that whether the dialer might be a predictive dialer in another context is not relevant or material here, because the informational calls do not involve "live agent" telemarketing calls.  (2014 Montano Aff., ¶¶ 14-15.)

irrelevant.  (Def.'s Ex. 7 – Pl.'s Resp. to RFA No. 5; ECF No. 82-8 – Expert Report of S. Visser at ¶ 9 – no record of Plaintiff's number in the DNC Data Extract.)  Third, DISH asserts that the Tracker reflects numbers that someone has asked to be removed as to *future* calls; it does not record or investigate how a number was originally added to a customer's account or otherwise determine issues of consent.[6]

DISH also asserts that Plaintiff concedes that all of the telephone numbers called – whether they are cellular or landline numbers – are *provided by DISH customers.* Thus, DISH asserts that scrubbing for cellular numbers does not bear on whether DISH was authorized to call the cellular number.  Finally, DISH asserts that Mr. Biggerstaff's testimony is based upon rank speculation because although Plaintiff obtained an order that his expert could run queries and examine the database, he "determined to forgo" having his expert do so.  (*See* ECF No. 200.)

III.   ANALYSIS

A.   Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' if, under the

---

[6] Mercedes Metzger, who was responsible for the creation, oversight, data entry and management of the TCPA Tracker, testified that the purpose of the Tracker is to place numbers on Do Not Call lists (for telemarketing calls), or to suppress the numbers (for informational calls).  (ECF No. 83-5 – Metzger Aff. in Support of DISH Opp'n to Class Certification at ¶¶ 10-19.)  One-third of the individuals provide no information other than a number, many provide generic or made-up names, and callers often had a familial, business or living relationship with the account holder showing, according to DISH, that it had permission to call the numbers.  (*Id.* ¶¶ 15, 18(a)-(f), 19; ECF No. 82-8 – Expert Report of S. Visser ¶ 10.)

governing law, it could have an effect on the outcome of the lawsuit." *E.E.O.C. v. Horizon/ CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party.  *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1190.  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).  When applying the summary judgment standard, the court must "'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Id.* (quotation omitted).  All doubts must be resolved in favor of the existence of triable issues of fact.  *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

B.   The Merits of the Motion

1.   Whether the TCPA Applies to Calls to Cellular Telephones Used for Business Purposes

DISH first argues that Plaintiff's cellular telephone number is used for business purposes, and that the TCPA does not apply to a business telephone number.  I acknowledge that the evidence shows Plaintiff's telephone was used for business purposes, but Plaintiff testified that the majority of its use was as a personal cell phone

number.  In any event, this is not material because I reject DISH's argument that the

TCPA is inapplicable to calls made to cellular telephones used for business purposes.

47 U.S.C. § 227(b)(1) contains the four "Prohibitions" restricting the use of

automated telephone equipment.  This statute states, "It shall be unlawful for any person

within the United States, or any person outside the United States if the recipient is within

the United States–

> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice–

> (i) to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

> (ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

> (iii) to **any telephone number assigned to a** paging service, **cellular telephone service**, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

> (B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B);

> (C) to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement. . . . ;

> (D) to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

47 U.S.C. § 227(b)(1)(A) - (D) (emphasis added).

47 U.S.C. § 227(b)(2) outlines the "Regulations; exemptions; and other

provisions".  It states in pertinent part, "The Commission shall prescribe regulations to

implement the requirements of this subsection.  In implementing the requirements of this subsection, the Commission--

(A) shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent; . . . .

DISH argues that, read together, the TCPA does not prohibit calls made to cellular numbers of businesses.  I reject DISH's argument.  I first note that "'[w]here statutory language is clear and unambiguous, that language is controlling and courts should not add to that language.'"  *Marx v. Gen. Revenue Corp.*, 668 F.3d 1174, 1186 (10th Cir. 2011) (quotation omitted).  In the TCPA, Congress specifically delineated when the subsections were applicable to businesses (*see, e.g.,* § 227(b)(1)(D)) or to residential lines (§ 227(b)(1)(B)).  However, when it referred to cellular telephone and related services, it prohibited calls to "any telephone number" associated with those services.  The law is clear that "if 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"  *Id.* (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *see also Anderson v. United Tel. Co. of Kan.,* 933 F.2d 1500, 1502 (10th Cir.1991) ("[T]he legislature's use of two different terms is presumed to be intentional.").  In light of this, I find it should be presumed that Congress acted intentionally and purposely in making clear that *any* call to a cellular telephone, whether assigned to a business or not, is prohibited under the TCPA when the other requirements are met.

This finding is also consistent with the Tenth Circuit's holding that when Congress uses the general term "any" to modify a term, as in § 227(b)(1)(A)(iii), "it meant to give that term an 'expansive' meaning." *United States v. Porter*, 745 F.3d 1035, 1042 (10th Cir. 2014). It is also consistent with holdings from other courts. *See De Los Santos v. Milward Brown, Inc.*, No. 13-80670, 2014 WL 2938605, at *7 (S.D. Fla. June 30, 2014) ("Defendant premises its vagueness argument on the belief that the TCPA does not prohibit autodialing a business employee's cellular phone. This belief is unfounded. In truth, the TCPA prohibits such calls, even if the business pays for it."); *Cellco P'ship v. Plaza Resorts, Inc.*, 2013 WL 5436553, at *5 (S.D. Fla. Sep. 27, 2013) (recognizing that when a subscriber uses a telephone for business purposes, he or she has a cause of action under the TCPA). DISH has not cited any authority to the contrary. My finding is also consistent with the fact that businesses have a cause of action under the TCPA. *See Cellco P'ship*, 2013 WL 5436553, at *6 (the statute "recognizes that the cause of action can accrue to an entity as opposed to a natural person") (citing § 227(b)(3)).

I also reject DISH's argument that if § 227(b)(1)(A) was intended to apply to calls made to business numbers, including business cellular telephones, there would be no reason for § 227(b)(2) to authorize the FCC to "consider prescribing regulations" to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent. I disagree. Section § 227(b)(1)(A)(i) and (ii) prohibit calls only to certain types of business telephone lines, thus implying that calls to other business lines using an ATDS or an artificial or prerecorded voice are permitted. Moreover, § 227(b)(1)(D) refers specifically to businesses and prohibits calls

only to two or more telephone lines simultaneously of a multi-line business.  In apparent recognition of these limitations, § 227(b)(2) gave Congress the authority to prescribe calls made to all businesses.[7]  This has no impact, however, on § 227(b)(1)(iii) which already prohibits such calls.

Finally, I reject DISH's argument that § 227(b)(1)(D) would be rendered superfluous if calls made to businesses were already covered under § 227(b)(1)(A). Those two sections of the TCPA are conceptually distinct.   Section 227(b)(1)(A) applies to calls to emergency lines of hospitals and similar entities, to telephone lines of guest or patient rooms of a hospital and similar entities, and to paging or cellular telephone services or related services.  By contrast, § 227(b)(1)(D) prohibits an automatic telephone dialing system from engaging two or more landlines of a multi-line business. The fact that I find calls to cellular telephone service are prohibited under § 227(b)(1)(A)(iii), whether business related or not, has no impact on the separate requirement that an ATDS not engage more than one line of a multi-line business.

In conclusion, I deny summary judgment as to the argument that the TCPA does not apply to calls made to a cellular telephone number used for business purposes.

> 2.  <u>Whether DISH Was Using an Automatic Telephone Dialing System ["ATDS"]</u>

DISH also argues that Plaintiff's claim fails under the TCPA because the evidence shows it does not use an ATDS, a threshold element for a TCPA violation.  I also deny

---

[7] The FCC did, in fact, consider prescribing  prohibitions on calls made to businesses, and explicitly declined to do so.  *In re Rules and Regulations Implementing the TCPA of 1991*, 7 FCC Rcd. 8752, 8756 n.7 ("1992 FCC Order").

DISH's motion for summary judgment as to this argument.  I first note that 47 U.S.C.

§ 227(b)(1) does not require the use of an ATDS.  It "prohibits person from (1) making

'any call,' (2) 'using any automatic telephone dialing system [ATDS] *or an artificial or*

*prerecorded voice*' (3) 'to any telephone number assigned to a . . . cellular telephone

service. . . .'" *See Vaccaro v. CVS Pharmacy, Inc.*, 2013 WL 3776927, at *1 (S.D. Cal.

July 16, 2013).  The *Vaccaro* court held, and I agree, that "[b]ecause the provision is

written in the disjunctive, plaintiffs can state a claim under the TCPA by alleging the use

of (1) an 'artificial or prerecorded voice' *or* (2) an ATDS."  *Id.* at *n. 2.; *see also Holcombe*

*v. Credit Protection Ass'n, LP*, No. 14-cv-14, 2014 WL 4252277, at *3 (M.D. Ga. Aug. 28,

2014); *Lardner v. Diversified Consultants Inc.*, No. 13-cv-22751, 2014 WL 1778960, at *6

(S.D. Fla. May 1, 2014); *Vance v. Bureau of Collection Recovery LLC*, No. 10-cv-06342,

2011 WL 881550, at *3 (N.D. Ill. March 11, 2011).  Here, there is evidence that DISH

made calls using a prerecorded voice.

Even if Plaintiffs are required to prove that an ATDS was used, I find that

summary judgment must still be denied on this issue.  DISH is correct that an ATDS is

defined as "equipment which has the capacity—(A) to store or produce telephone

numbers to be called, using a random or sequential number generator; and (B) to dial

such numbers."  47 U.S.C. § 227(a)(1).  The Ninth Circuit ruled in *Satterfield v. Simon &*

*Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009), as a matter of first impression, that the

plaintiff must demonstrate that "the equipment has the *capacity* 'to store or produce

telephone numbers to be called, using a random or sequential number generator.'"  *Id.* at

951 (emphasis in original).

The FCC, which Congress vested with authority to prescribe regulations implementing the TCPA's requirements, has interpreted an ATDS as "cover[ing] any equipment that has the specified capacity to generate numbers and dial them without human intervention, regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." *In Re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 F.C.C.R. 14014, 14092 (July 3, 2003).  Further, it ruled that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress". *Id.* at 14092-093.

In 2008, the FCC issued an order affirming its ruling that predictive dialers are subject to the TCPA's restrictions on the use of auto-dialers.  *In re the Rules and Regulations Implementing the Tele. Consumer Prot. Act of 1991,* 23 FCC Rcd. 559, 566 (2008).  I find that these rulings are entitled to deference.  *See Davis v. Diversified Consultants, Inc.*, No. 13-cv-10875, 2014 WL 2944864, at *5 (D. Mass. June 27, 2014). Indeed, this expanded definition of an ATDS per the FCC rulings has been adopted by almost every court that has looked at the issue.  *See, e.g., Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012); *Sherman v. Yahoo! Inc.*, 997 F. Supp. 2d 1129, 1135 (S.D. Cal. 2014); *Holcombe*, 2014 WL 4252277, at *2-3; *Sterk v. Path, Inc.*, No. 13 C 2330, 2014 WL 2443785, at *3-4 (N.D. Ill. May 30, 2014).  As the *Sterk* court noted, "[t]he congressional history of 47 U.S.C. § 227(a)(1) shows that Congress envisioned that the language in the TCPA might not be able to account for

future changes in technology, and that the FCC might need to interpret the TCPA to account for changes in technologies.  2014 WL 2443785, at *4.

Based upon the foregoing definition, I find that there are genuine issues of material fact as to whether DISH's system is an ATDS.  While DISH provided evidence that its dialer does not have the capacity to use a random or sequential number generator, and that the dialer requires human intervention to input the numbers and/or to formulate the query rules that generate the dialing lists, Plaintiff provided evidence that suggests the dialer stores the numbers in a database that is part of the dialing system, that the dialer has a sequential dialing mode, and that the dialer itself places calls over the carrier network without human intervention and plays a prerecorded message if there is a person at the other end of that call.  *See Sherman*, 997 F. Supp. 2d at 1136 (finding genuine issue of material fact because the parties dispute whether the technology "has the requisite capacity to **both** store number and dial random or sequential numbers"); *see also Satterfield*, 569 F.3d at 951.

Moreover, Mr. Famous testified on behalf of DISH that the dialer is a predictive dialer and his testimony suggests that calls can be made without human intervention. Accordingly, summary judgment is also denied on this ground.  *See Davis*, 2014 WL 2944864, at *5 (finding that even if the defendants' evidence "correctly states that its system cannot dial randomly or sequentially, it is undisputed that LiveVox is a 'predictive dialer' that dials from lists of numbers"); *Chavez v. Advantage Group*, 959 F. Supp. 2d 1279, 1281 n. 3 (D. Colo. 2013).

3.   Whether Judgment is Appropriate Because the Calls Were Informational or Because Plaintiff Suffered No Injury

DISH's next argument is that none of the calls to Plaintiff's number were telemarketing calls, and the TCPA was never intended to prohibit businesses from placing informational calls to customers about their accounts, especially when the numbers called are provided by the customers themselves.  Instead, DISH asserts that Congress enacted the TCPA in response to an increasing number of consumer complaints regarding "[t]he use of automated equipment to engage in *telemarketing*." Senate Report, S. Rep. No. 102-178, at 1 (emphasis added).  DISH asserts that deeming this claim to be exempt from the prohibitions set forth in the TCPA is consistent with the FCC's 2012 Order, where it noted that "purely informational calls" should be treated differently than telemarketing calls.  *See In re Rules and Regulations Implementing the TCPA of 1991*, 27 FCC Rcd. 1830, 1831 (2012) ("2012 FCC Order"). For example, the 2012 FCC Order noted that the FCC did not want to unnecessarily restrict access to informational calls such as "bank account balance, credit card fraud alert, package delivery, and school closing information."  *Id.* at 1838.

I reject DISH's argument that the TCPA applies only to telemarketing calls, not to informational calls.  As Plaintiff notes, while Congress was concerned by telemarketing calls, that was not its only concern.  When it enacted the TCPA, Congress found that "automated or pre-recorded calls are a nuisance and an invasion of privacy, *regardless of the type of call*", and decided that "banning" such calls made without consent was "the only effective means of protecting telephone consumers from this nuisance and privacy

invasion."  Pub. L. No. 102-243, §§ 2 (10-13) (Dec. 20, 1991) (emphasis added), codified at 47 U.S.C. § 227.

Further, while Congress did limit certain provisions of the TCPA to telemarketing calls, it did so through *explicit* qualifying language.  *See* §§ 227(b)(1)(B) and (b)(2)(B) (regulating calls to residential telephones and directing the FCC to consider exempting calls that did not include unsolicited advertisements, which the FCC ultimately did at 47 C.F.R. §64.1200(a)(3)); § 227(b)(1)(C) (applying to unsolicited advertisements); § 227(c) (applying to telephone solicitations).  There is no such qualifying language in § 227(b)(1)(A) that would limit its scope to telemarketing calls.  Congress clearly knew how to do so if it desired, but chose not to because it wanted to regulate prerecorded calls "regardless of the type of call."  *See Rodriguez*, 480 U.S. at 525 ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.")

My finding that § 227(b)(1)(A) is not limited to telemarketing calls is also supported by case law.  Thus, in *Leckler v. Cashcall, Inc.*, 554 F. Supp. 2d 1025, 1032-33 (N.D. Cal. 2008), the court held that "§ 227(b)(1)(A) "applies to wireless numbers regardless of the content of the call, and is not limited only to calls that constitute telephone solicitations") (*citing In re Rules Implementing the TCPA of 1991*, 23 FCC Rcd 559 at ¶ 11 (2007)).  Similarly, the court held in *Shupe v. JPMorgan Chase Bank of Ariz.*, No. CV 11-00501-TUC-RCC, 2012 WL 1344820, at *7 (D. Ariz. March 14, 2012), that "[b]ecause the TCPA makes it unlawful "to make any call" using an automatic telephone

dialing system or an artificial or prerecorded voice, see 47 U.S.C. § 227(b)(1)(A), it is irrelevant that Plaintiff, at this time, has not alleged that the calls were solicitations or telemarketing calls."

DISH also argues that summary judgment should be granted because Plaintiff was not charged for any call and suffered no injury.  DISH asserts that the only plausible explanation for why the statute differentiated between calls made to cellular devices (§ 227(b)(1)(A)(iii)) and calls made to landlines (§ 227(b)(1)(B)) is the fact that mobile users, at the time, were charged for the calls.  Indeed, DISH argues that the Congressional intent of this portion of the statute was to avoid shifting the cost of advertising to the recipient.  I also reject this argument.

Section 227(b)(1)(A)(iii) regulates calls made "to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, *or* any service for which the called party is charged for the call." (emphasis added).  This section is written in the disjunctive; thus, it applies *either* to calls made to a cellular number service or related service *or* to calls made to services for which the receiving party is charged for the call.  *See Celaya Martinez v. Holder*, 493 F. App'x 934, 939 (10th Cir. 2012) ("When 'or' is used in a statute, 'it is presumed to be used in the disjunctive unless the legislative intent is to the contrary.'").

Numerous cases interpret § 227(b)(1)(A)(iii) in this manner.  *See Iniguez v. CBE Group*, 969 F. Supp. 2d 1241, 1246 (E.D. Cal. 2013) ("The TCPA prohibits making offending calls to a cellular number in addition to other services for which the called party is charged, but there is no statutory requirement that a recipient be charged for an

incoming call on a cellular line in order for a violation to occur."); *Manfred v. Bennett Law, PLLC*, No. 12-CV-61548, 2012 WL 6102071, at *5 (S.D. Fla. Dec. 7, 2012) ("the language of the statute makes it apparent that Plaintiff need not allege that he was charged for the call if he has alleged that the call was made to his cell phone"); *Buslepp v. Improv Miami, Inc.*, No. 12-60171, 2012 WL 1560408, at *2 (S.D. Fla. May 4, 2012) ("Defendant also contends that the TCPA requires an allegation that the called party was charged. Plaintiff argues that § 227(b)(1)(A)(iii) is phrased with the disjunctive 'or' separating various clauses. Thus, if a call is made to a telephone number assigned to a cellular telephone service, such as in the present action, than that allegation is sufficient to assert a claim. A plaintiff could alternatively state a claim if his telephone number is assigned to any service for which the called party is charged. The Court agrees with Plaintiff's interpretation of this unambiguous statute. Because Plaintiff uses a cellular telephone service, he need not separately allege that he was charged for the call."). I adopt the rationale of these cases and find that Plaintiff is not required to show he was charged for the call.

I also agree with Plaintiff that the conclusion that § 227(b)(1)(A)(iii) regulates calls made to cellphones regardless of whether the user is charged for the call is compelled by the fact that Congress amended the TCPA to explicitly give the FCC authority, if it so desired, to "exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party." 47 U.S.C. § 227(b)(2)(C). It would have made no sense for Congress to do so if §227(b)(1)(A)(iii) already required the called party to be charged for the call.

*See Abbas v. Selling Source*, No. 09 CV 3413, 2009 WL 4884471, at *3 (N.D. Ill. Dec. 14, 2009) ("If uncharged called were already exempted from the requirements of the TCPA, […] the later congressional amendment would be wholly superfluous, as no FCC rule or order would be necessary to exempt such calls.")

In considering the authority given to it by Congress, the FCC has not exempted the calls at issue here because, as it has repeatedly held, the users of cellular telephone numbers *are indeed charged* for incoming calls, regardless of whether they incur any *additional* charges for such calls.  Thus, in its 2003 Order the FCC stated:

> The commission has long recognized, and the record in this proceeding supports the same conclusion, that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used. Wireless subscribers who purchase a large "bucket" of minutes at a fixed rate nevertheless are charged for those minutes[.]"

*In re Rules and Regulations Implementing the TCPA of 1991*, 18 FCC Rcd. 14014, 14115 (2003).  Similarly, in its 2007 Order, the FCC affirmed that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used".  *In re Rules Implementing the TCPA of 1991*, 23 FCC Rcd 559, 562 (2007). The case law is in accord.  *See, e.g.*, *Fini v. DISH Network L.L.C.*, 955 F. Supp. 2d 1288, 1297 (M.D. Fla. 2013); *Lee v. Credit Management*, 846 F. Supp. 2d 716, 729 (S.D. Tex. 2011).

Based on the foregoing, I deny DISH's Motion for Summary Judgment as to the argument that the TCPA applies only to telemarketing calls, not informational calls, and its argument that Plaintiff suffered no injury from DISH's calls because it was not charged for any of the calls.

4.     Whether DISH Can Be Liable for Calls Warnick Did Not Receive and
Where He Was Not the Intended Recipient

DISH next argues that it cannot be liable for calls Warnick did not receive.  It

asserts in that regard that while DISH attempted to make eight calls to Plaintiff's number,

he only received one of these calls, and that § 227(b)(1)(A) prohibits only the making of

calls, not attempted calls.  DISH further asserts that since § 227(b)(1)(B) governs calls

that are initiated, and § 227(b)(1)(C) governs "use", the term "make" in  § 227(b)(1)(A)

must be construed to encompass initiating *and getting through* to the intended recipient.

Since Warnick's phone records show only one call was made, DISH contends that the

remainder of the calls it attempted to make are not actionable under the statute.  I

disagree.

First, as discussed in Section II, *supra*, I find that there are genuine issues of

material fact as to whether the other seven calls that DISH alleges it attempted went to

Plaintiff's voicemail.  The TCPA "does not distinguish between calls that are picked up

and calls that go to voicemail."  *Castro v. Green Tree Servicing*, 959 F. Supp. 2d 698,

720 (S.D.N.Y. 2013) ("the TCPA clearly restricts the *making* of any call using an

automatic telephone dialing system to a cellular phone,. . .[a]ccordingly, for purposes of

Plaintiffs' TCPA claim, it is immaterial whether the Plaintiffs picked up all of Defendants'

calls or whether several of the calls went unanswered.")

Moreover, DISH cites no authority in support of its argument that the term "make"

also requires the "receipt" of a phone call, and this argument has been rejected by the

Ninth Circuit and numerous other courts.  *See Satterfield*, 569 F.3d at 953-54 (holding

that "to make any call" in §227(b)(1)(A) means "to communicate with *or try to* get into communication with a person by telephone") (emphasis added); *Ashland Hosp. Corp. v. Serv. Employees Intern. Union*, 708 F.3d 737, 742 (6th Cir. 2013) (adopting the definition in *Satterfield*), *Fillichio v. M.R.S. Associates*, No. 09-61629, 2010 WL 4261442, at *3 (S.D. Fla. Oct. 19, 2010) ("it is the mere act of placing the call that triggers the statute."); *Joffe v. Acacia Mortgage Corp.*, 211 Ariz. 325, 330 (Ariz. Ct. App. 2005) ("It is the act of making a call, that is, of attempting to communicate to a cellular telephone number using certain equipment, that the TCPA prohibits. . . .Accordingly, we hold an attempt to communicate by telephone constitutes a call under the TCPA even if the attempted communication does not present the potential for two-way real time voice intercommunication.")

DISH also argues that it cannot for liable for calls because Plaintiff Warnick was not the intended recipient.  I agree that Warnick himself, who was not a customer of DISH, was not the intended recipient; instead, the evidence is undisputed that DISH believed during the relevant period that this telephone number was assigned to a customer of DISH.  I also note that "[c]ourts are divided as to whether a 'called party' is the 'actual recipient' or the 'intended recipient.'"  *Gusman v. Comcast Corp.*, No. 13CV1049-GPC, 2014 WL 2115472, at *3 (S.D. Cal. May 21, 2014) (citing *Cellco P'ship v. Wilcrest Health Care Mgmt. Inc.*, No. 09–3534(MLC), 2012 WL 1638056 (D.N.J. May 8, 2012) and *Olney v. Progressive Cas. Ins. Co.,* 993 F. Supp. 2d 1220 (S.D. Cal. 2014)).  The *Cellco Partnership* court agreed with the "burgeoning body of case law [which] establishes that only the "called party," *i.e.,* the "intended recipient," has statutory

standing to bring suit under the TCPA."  In comparison, the *Olney* court held that the "called party" is not limited to the "intended recipient".  The parties have cited no authority in the Tenth Circuit that resolves this issue.

I agree with the reasoning in the *Olney* case, finding the statutory construction of the issue particularly persuasive.  *Olney* acknowledged the defendant's argument that "because section 227(b)(1)(A) uses both the term 'recipient' and 'called party,' one may conclude that 'called party' means something different than 'recipient.'"  993 F. Supp. 2d at 1223.  Moreover, it agreed with the defendant that "identical words used in different parts of the same act are intended to have the same meeting.'"  *Id.* at 1223-24.  It then stated:

> Tellingly, section 227(d) states (in the context of faxes) that a system must "automatically release the called party's line within 5 seconds of the time notification is transmitted to the system that the called party has hung up, to allow the called party's line to be used to make or receive other calls." 47 U.S.C. § 227(d) (emphasis added). The only logical interpretation of "called party" as used in this section is the "actual recipient." Because section 227(d) unambiguously uses "called party" to mean the actual recipient, "called party" should carry the same meaning in other provisions.  *See Breslow v. Wells Fargo Bank, N.A.,* 857 F.Supp.2d 1316, 1321 (S.D.Fla.2012) ("The use of 'called party' to unambiguously refer to the actual recipient in another section of the TCPA is compelling evidence that the term carries the same meaning in other provisions.").

*Id.* at 1224.  Finally, the *Olney* court noted that "Defendant's position that only the intended recipient has standing to bring a claim under the TCPA has been squarely rejected in no less than twenty cases."  *Id.* (citing cases).

I adopt the *Olney* rationale, and find that summary judgment should be denied as to the argument that DISH is not liable because Warnick was not the intended recipient.

*See also Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, (7th Cir. 2012) ("The phrase 'intended recipient' does not appear anywhere in § 227, so what justification could there be for equating 'called party' with 'intended recipient of the call'?").

      5.    Whether DISH Can Be Liable for a Willful Violation of the TCPA

Finally, DISH argues that summary judgment should be granted on Plaintiff's second cause of action seeking treble damages based on allegations that DISH's purported TCPA violation was "willful" or "knowing." I agree as to this count.

Turning to my analysis, the court may treble damages if it finds that DISH's violations of the TCPA were committed "knowingly or willfully". 47 U.S.C. § 227(b)(3). The TCPA does not define these terms. The court in *Bridgeview Health Care Ctr. v. Clark*, 2013 U.S. Dist. LEXIS 37310 (N.D. Ill. 2013) noted a split of authority as to what these terms mean, with some courts holding that it means that the defendant "should have known" that its conduct might violate the statute, and others holding that it instead only requires that the defendant's conduct be volitional, i.e. it intended to dial the telephone number at issue. *Id.* at *20-23 (collecting cases). The Eleventh Circuit has held that ""the intent for treble damages does not require any malicious or wanton conduct, but rather is satisfied by merely 'knowing conduct." *Alea London, Ltd. v. Am. Homes Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011). Citing *Alea* and other cases, another recent case stated that "[m]ost courts have interpreted the willful or knowing standard to require only that a party's actions were intentional, not that it was aware it was violating the statute." *Davis*, 2014 WL 2944864, at *6. I find the reasoning of *Davis* persuasive and find that Plaintiff must show only that DISH's actions were intentional.

However, that does not resolve the question.  It is undisputed in this case that Plaintiff's telephone number was entered in DISH's CSG database in November 2010 as the current number of a then-current DISH customer account.  This number, which actually belonged to Plaintiff, was either provided by the customer or the result of a data entry error during a conversation.  It is further undisputed that the sole source of the telephone numbers that DISH utilizes when it makes account information calls are the customers themselves, which are entered into DISH's CSG database.  It is also undisputed that DISH requires each customer to provide contact information and to contractually agree to keep that number up to date so that DISH has a means to communicate with him or her.  Moreover, DISH provided evidence that its customer agreements reflect express authorization by the customer to be called.  (Picchione Aff. Ex. A at DISH 152, DISH 164, DISH 5635.)  Finally, Plaintiff did not notify DISH at any time that it was not permitted or authorized to call his number.

In this situation, I find the *Harris* case cited by DISH to be persuasive.  The *Harris* court first disagreed with the plaintiff's position there that in order to establish that defendants' conduct was willful or knowing, he only had to demonstrate that Defendants intended to use the autodialer to place the calls.  867 F. Supp. 2d at 895.  The *Harris* court found "two flaws" with the plaintiff's argument:

> First, it neglects the consent element of § 227(b)(1)(A).  In order for Plaintiff to prove that Defendants knew that they acted in a manner that violated the statute (regardless if Defendants actually knew that they were violating the statute), Plaintiff must also show that Defendants knew that Plaintiff did not consent to the phone calls. In this case, prior to Plaintiff notifying Defendants on August 23, 2010, Defendants could not have known that Plaintiff's 1233 number was not Morgan's phone number. Without knowing that the number

associated with Morgan's account was actually Plaintiff's number, Defendants' violations cannot be deemed willful or knowing.

Second, If the Court were to adopt Plaintiff's definition of willful then every violation of § 227(b)(1)(A) could be considered willful because every call would have been voluntarily made. A creditor or debt collector would be liable for treble damages for incidentally calling any person with an automated dialing system where the actual debtor provided the wrong phone number to Defendants. Such a broad application of "willful" or "knowing" would significantly diminish the statute's distinction between violations that do not require an intent, and those willful and knowing violations that congress intended to punish more severely.

*Id.*

I find this analysis persuasive and adopt it in this case.  Thus, while Plaintiff argues that DISH knew it was making thousands of robocalls through its autodialer to persons who were not DISH customers, that fact is not dispositive.  Plaintiff also has to show that DISH knew that Plaintiff did not consent to the phone calls.  He has not shown that in this case, as he never alerted DISH that its calls were improper because he was not a customer.  Since DISH could not have known during the time period in question that it was calling a person (a non-customer) without consent, I find that its actions were not willful or knowing within the meaning of the TCPA.  In so finding, I note that other cases have also adopted the *Harris* analysis and support my decision.  *See Olney*, 993 F. Supp. 2d at 1227 (denying motion to dismiss treble damages claim where plaintiff alleged he *notified* the defendant it was calling the wrong number and defendant continued to call); *Whaley v. T-Mobile, USA, Inc.*, No. 13-31-DLB-JGW, 2013 WL 5155342, at *3 n. 4 ("To recover under the TCPA plaintiff must show that T-Mobile 'knew that [p]laintiff did not consent to the phone calls").

Plaintiff's reliance on the TCPA tracker system, which he argues shows that DISH tracked complaints from thousands of non-DISH customers about calls being made to them, also does not support his argument that DISH's actions were willful or knowing. First, since Plaintiff never called DISH to complain, he was not listed in the TCPA Tracker and it is irrelevant as to him.  Moreover, DISH asserts that the Tracker reflects numbers that someone has asked to be removed as to *future* calls; it does not record or investigate how a number was originally added to a customer's account or otherwise determine issues of consent.  Finally, DISH has presented undisputed evidence that all of its calls are made to numbers provided by its customers.  Accordingly, I grant DISH's motion for summary judgment as to the claim for treble damages under § 227(b)(3).

IV.    CONCLUSION

Based upon the foregoing, it is

ORDERED that Defendant's Motion for Summary Judgment (ECF No. 190) is

**GRANTED IN PART AND DENIED IN PART**.  It is **GRANTED** as to the second cause of action seeking treble damages based on allegations that DISH's purported TCPA violation was "willful" or "knowing." It is **DENIED** as to the first claim asserting negligent violations of the TCPA.

Dated:  September 30, 2014

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge